POTOMAC PLAZA TERRACES,
INC., Plaintiff,

v.

QSC PRODUCTS, INC., and Ron–
Ike Foam Insulators, Inc.,
Defendants.

Civ. A. No. 93–1646 SSH.

United States District Court,
District of Columbia.

Nov. 28, 1994.

Warren Christopher Lutz, Jackson & Campbell, Washington, DC, for plaintiff.

Richard John Webber, Helen L. Gemmill, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for defendants.

## OPINION

STANLEY S. HARRIS, District Judge.

Before the Court is the motion for summary judgment of defendant QSC Products, Inc. ("QSC") in an action brought by plaintiff Potomac Plaza Terraces, Inc. ("PPT") for breach of implied warranty of merchantability, breach of contract, negligence, and strict liability. The Court denies defendant's motion for summary judgment on the implied warranty and contract claims, but grants defendant's motion for summary judgment on the negligence claim. Lastly, the Court grants in part defendant's motion for summary judgment on the strict liability claim for damages for the loss of value or use of defendant's polyurethane coatings, and denies summary judgment on the strict liability claim for damages related to the remainder of the roofing system and the PPT building structure. Although findings of fact and conclusions of law are unnecessary in ruling on a summary judgment motion, the Court nonetheless sets forth its reasoning. *See* Fed. R.Civ.P. 52(a).

### Background

Plaintiff, a housing cooperative corporation with its principal place of business located at 730 24th Street, N.W., Washington, D.C., seeks compensatory, consequential, and incidental damages, and pre- and post-judgment interest for damages allegedly arising from a defective roofing system that included materials manufactured and warranted by defendant. Plaintiff alleges four counts against defendant: breach of an implied warranty of

merchantability, breach of contract, negligence based on duties established by the contract, and strict liability for the performance of a product introduced into the stream of commerce by defendant.

In 1989, plaintiff accepted an offer by Ron–Ike Foam Insulators, Inc. ("Ron–Ike"), a Pennsylvania corporation, to sell and install two roofing systems using a polyurethane coating manufactured by QSC.[1] Ron–Ike agreed to cover the building's main roof, located above the ninth floor ("Roof 1"), with an insulating layer of polyurethane foam manufactured by IPI Chemical Corporation ("IPI"). Ron–Ike would then spray the foam with a specified thickness of defendant's QSC–510 Polyurethane Protective Coating, which is intended to protect the foam underneath from weather damage and ultraviolet light.

In August of 1989, plaintiff and Ron–Ike entered into a supplemental agreement in which a canopy over the building's main entrance ("Roof 2") would be covered with a specified thickness of defendant's QSC–5013 Pedestrian Waterproofing Coating, applied directly to the roof's concrete surface. The 5013 coating is designed to protect the concrete from water and other weather damage.

On August 27, 1989, Ron–Ike tendered the described materials and installed the two roofing systems. After a field representative inspected the site, defendant issued a ten-year warranty for its 510 coating and a five-year warranty for its 5013 coating. Plaintiff alleges that the roofs began leaking water after only three years, and that the coatings on both roofs deteriorated, cracked, and failed to provide the protection described in defendant's technical data sheets.

Plaintiff notified defendant in December of 1992 that its roofs were leaking, and defendant's field representative inspected the PPT facility in early January. The representative observed "deterioration" of the coating and "adhesion loss and delamination of coating

---

1. Plaintiff's complaint also names Ron–Ike as a defendant in this case, including claims for damages based on six counts: negligence, breach of contract, breach of an implied warranty of merchantability, breach of an implied warranty of fitness for a particular purpose, strict liability, and fraud. The Court declared Ron–Ike in default after it failed to file an answer to plaintiff's complaint. Default, filed Sept. 22, 1993.

... where ponding occurs." Letter from Stauffer to Flanagan of 1/6/93. He concluded, however, that the roofs did not leak.

Plaintiff then expressed its dissatisfaction with the roofing systems and informed defendant that, as a remedy pursuant to its warranty, it wished to have the foam roofing system replaced with a more conventional "tar and gravel" system. Defendant notified plaintiff on February 5, 1993, that it would not finance the removal of the foam roofing system as a remedy under the warranty. Defendant offered to provide at no charge its "second generation" QSC–701 Adhered Membrane as well as technical assistance if plaintiff decided to remove the existing roof at its own expense. Otherwise, defendant refused to finance any other costs arising from replacement of the foam roofing systems.

On April 1, 1993, defendant's representatives again inspected the PPT facility. They observed water damage to the building's ninth floor but noted that the age of this damage was indeterminate. To fulfill its obligation under the warranty, defendant offered to respray Roof 1 with its 510 coating, which it contends would have repaired any areas where the coating had deteriorated. Defendant repeated this offer on two other occasions, but plaintiff rejected the proposed repairs based on its belief that a second coating would fail to prevent further leaks.

Plaintiff ultimately retained another contractor to replace the foam roofing system. Subsequently, plaintiff filed this suit against defendant on July 9, 1993.

### Discussion

■ A court should grant summary judgment if the pleadings, depositions, answers to interrogatories, and affidavits show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

If material facts are "susceptible to divergent inferences bearing upon an issue critical to the disposition of the case, summary judgment is not available." *Alyeska Pipeline Serv. Co. v. EPA,* 856 F.2d 309, 314 (D.C.Cir. 1988). Furthermore, the Court must consider the facts in such a way that its inferences are drawn in a light most favorable to the nonmoving party. *White v. Fraternal Order of Police,* 909 F.2d 512, 516 (D.C.Cir.1990). Defendant contends that there are no genuine issues of material fact and that judgment of a matter of law is appropriate on all four counts.

### 1. Breach of Implied Warranty of Merchantability

■ In the District of Columbia, a contract for the sale of goods includes an implied warranty of merchantability if the seller has reason to know of any particular purpose for which the goods are required and that the buyer is relying on the seller's skill to furnish suitable goods. D.C.Code Ann. § 28:2–315 (1981). However, the parties may delete this implied warranty by including an exclusion clause within the contract that specifically mentions merchantability and is sufficiently conspicuous. *Id.* § 28:2–316(2). Here, the written warranties announce, in capital letters, "THE FOLLOWING IS MADE AND GIVEN IN LIEU OF ANY AND ALL OTHER WARRANTIES AND GUARANTEES, EITHER EXPRESS OR IMPLIED, INCLUDING WARRANTY OF MERCHANTABILITY...."[2] This clause is both sufficiently conspicuous and specific to exclude an implied warranty of merchantability.[3]

■ Plaintiff argues, however, that the exclusion clause is inapplicable on the ground that defendant's products fall within an exception to § 2–316(2) for "consumer goods." *Id.* § 28:2–316.1(1). The Court disagrees.

---

**2.** Defendant issued two separate warranties, one for the 510 coating applied to Roof 1 and another for the 5013 coating applied to Roof 2. The two warranties contain identical language in the clause excluding the implied warranty of merchantability.

**3.** Defendant correctly argues that the clause also is sufficiently conspicuous to exclude a claim based on an implied warranty of fitness for a particular purpose. *See* D.C.Code Ann. § 28:2–316(2). However, plaintiff's complaint names only Ron–Ike, not QSC, in its claim for breach of an implied warranty of fitness for a particular purpose.

For the purposes of § 2–316.1(1), consumer goods consist of products used or bought for use primarily for personal, family, or household purposes. *Id.* § 28:9–109. Although District of Columbia courts have not specifically defined "household purposes" as they relate to an implied warranty of merchantability, the D.C.Code elsewhere defines "household goods" to include "furniture, furnishings and personal effects used by the depositor in the dwelling." *Id.* § 28:7–209. A court interpreting a statute should, whenever possible, read the provision in harmony with other provisions to which it naturally relates. *Carey v. Crane Serv. Co.*, 457 A.2d 1102, 1108 (D.C.1983) ("Statutory provisions are to be construed not in isolation, but together with other related provisions.") (citing *United Marine Workers of Am. v. Andrus*, 581 F.2d 888, 892 (D.C.Cir.), *cert. denied*, 439 U.S. 928, 99 S.Ct. 313, 58 L.Ed.2d 321 (1978)).[4] Because roofing materials are not furniture, furnishings, or personal effects, defendant's products cannot be considered to be used for household purposes.[5] Defendant's roofing products thus do not fall within the consumer goods exception and the clause excluding the implied warranty is valid.

▇ Despite the apparent validity of the exclusion clause, summary judgment for the defendant on the implied warranty of merchantability is inappropriate. The law imposes an obligation of good faith in the enforcement or performance of every contract. *See* D.C.Code Ann. § 28:1–203. *See also* 1 Ronald A. Anderson, Uniform Commercial Code § 1–203:14, at 382 (3d ed. 1981) ("When

a party acts in bad faith, he will ordinarily be denied the benefit of any provision or concept that would improve his position."). If bad faith is alleged pertaining to a disclaimer of warranty, the disclaimer will not be held binding if it is shown that its inclusion in the contract was a violation of the obligation of good faith. *See, e.g.,* 1 James J. White and Robert S. Summers, Uniform Commercial Code § 12–11, at 611 (3rd ed. 1988) ("[S]ection 2–316 does not state expressly that all disclaimers meeting its requirements are immune from general policing provisions like … 1–203."); 3 Anderson, *supra* § 2–316:36, at 349.

▇ For a contract made by a merchant, good faith is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." D.C.Code Ann. § 28:2–103(1)(b). Allegations concerning a party's honesty in fact focus on the parties' subjective mental states, and are thus "notoriously difficult to resolve on motion for summary judgment." *See Gatoil (U.S.A.), Inc. v. WMATA*, 801 F.2d 451, 456 (D.C.Cir.1986). *See also* 1 Anderson, *supra* § 1–203:15 ("Whether a party acted in good faith is ordinarily a question of fact to be determined by the trier of fact.").

▇ Here, plaintiff contends that defendant issued its warranties without first conducting adequate weather and durability testing of the 510 coating,[6] without properly training and instructing the field employee who issued the warranty,[7] and without following its own policies for investigating Ron–Ike's qualifications to install the roofing system.[8] Taken together, these circumstances

---

4. Significantly, §§ 2–316, 9–109, and 7–209 all were approved simultaneously when the District of Columbia adopted the Uniform Commercial Code in 1965.

5. In addition, other authorities have rejected the inclusion of roofing materials within the definition of consumer goods when considered in a warranty context. *Cf.* Rules, Regulations, Statements and Interpretations under the Magnuson–Moss Warranty Act, 16 C.F.R. § 700.1(e) (1993) (when roofing materials "are at the time of sale integrated into the structure of a dwelling they are not consumer products as they cannot be practically distinguished from realty").

6. Defendant's testing was limited to application of the coating to aluminum panels, not polyurethane foam. *See* Dep. of James Bolotin at 30.

7. Defendant's field representative made approximately six cuttings of the 510 coating after it was applied in order to test its thickness. *See* Dep. of George Stauffer at 50–51. Defendant's company policy, however, is that the coating should not be interrupted under any circumstances. *See* Dep. of Roy Flanagan at 74–75.

8. Defendant's data sheet specifies the minimum qualifications of companies wishing to serve as applicators of its roof coatings, adding that "the applicator shall be approved by the coating mate-

present a genuine question of material fact whether defendant acted in good faith in including a disclaimer of the implied warranty of merchantability. Thus, summary judgment is denied with respect to plaintiff's claim for damages based on this implied warranty.

## 2. Breach of Contract

### A. Exclusive Remedy Clause

■■■ The District of Columbia allows parties to limit the remedies available for a breach of contract as long as the prescribed remedy is exclusive and does not fail of its essential purpose. D.C.Code Ann. § 28:2-719. Here, the contract contains a clause limiting plaintiff's remedies: "[plaintiff] agrees to accept the repairs referred to herein as [its] exclusive remedy and as the limit of [defendant's] ... liability." This type of specification in the contract language clearly fulfills the requirement that the remedy is intended to be exclusive. See, e.g., District Concrete Co. v. Bernstein Concrete Corp., 418 A.2d 1030, 1036 (D.C.1980); McGregor & Werner Graphics, Inc. v. Cottrell Co., C.A. No. 517–72 (D.D.C. Dec. 21, 1972), aff'd, 492 F.2d 669 (1974), cited in Potomac Elec. Power Co. v. Westinghouse Elec. Corp., 385 F.Supp. 572, 575 (D.D.C.1974).

■■■ However, plaintiff has raised a genuine issue of material fact whether the contract's exclusive remedy failed its essential purpose. While District of Columbia courts have not assessed the standard for determining whether an exclusive remedy fulfills its essential purpose, most other jurisdictions examine "a violating party's compliance with the already limited contractual remedy." See, e.g., Dowty Communications v. Novatel Computer Systems, 817 F.Supp. 581, 587 (D.Md.1992) (applying Maryland law); [9] Board of Directors of City of Harri-

man Sch. Dist. v. Southwestern Petroleum Corp., 757 S.W.2d 669 (Tenn.Ct.App.1988) (exclusive remedy failed of its essential purpose under § 2–719 when a roofing products vendor was required only to provide sufficient amounts of its own products as its exclusive "repairs," and the products did not, and could not, repair the roof any more than the original products could).

■■■ Additionally, the examination of an exclusive remedy's ability to fulfill its essential purpose, as well as an analysis of the violating party's compliance with the limited remedy, presents a question of fact. See, e.g., Delhomme Indus., Inc. v. Houston Beechcraft, Inc., 669 F.2d 1049, 1063 (5th Cir.1982); Dowty Communications, 817 F.Supp. at 587–88. See also 5 Anderson, supra § 2–719:37, at 34–35. Here, plaintiff alleges that defendant's proposal to "power wash" the foam roofing system with a high-pressure water sprayer, afterwards reapplying an additional layer of 510 coating, would not only fail to repair the roof's leaks but would compound the present damage. Defendant counters that the foam would be dry when the additional coating is applied, and that the procedure would fulfill its obligations under the warranty. With both parties presenting affidavits of roofing experts to fortify their claims, the Court finds that a genuine issue of material fact exists as to whether the repairs would fulfill the exclusive remedy's essential purpose. Thus, on plaintiff's breach of contract claim for damages relating specifically to the coating itself, summary judgment is denied.

### B. Exclusion of Consequential Damages

Assuming the exclusive remedy fails of its essential purpose, defendant still may be entitled to summary judgment with respect to consequential damages if the contract ade-

___

rials manufacturer." Quaker Deck Coatings System QSC–5013 for Pedestrian Decks Data Sheet ¶ 1.3.A. However, defendant's investigation of Ron–Ike was limited to the company's financial health. See Flanagan Dep. at 33–34, 60.

9. Although Maryland statutes and case law do not constitute the law of the District of Columbia, courts customarily look to Maryland law as "especially persuasive authority" in determining

how the District of Columbia courts would rule on a question of law. Napoleon v. Heard, 455 A.2d 901, 903 (D.C.1983). See also Conesco Indus., Ltd. v. Conforti & Eisele, Inc., 627 F.2d 312, 315–16 (D.C.Cir.1980) ("Since there is no District law on point, we should look to Maryland law first ... because the District of Columbia derives its common law from that state and because District of Columbia courts have in the past looked to Maryland law for guidance.").

quately disclaims the party's liability for such damages. *See Dowty Communications*, 817 F.Supp. at 585 (noting that if a movant succeeds in undermining a limited repair remedy, its opportunity to collect consequential damages still depends on whether a separate restriction on consequential damages is invalid). The Court finds that the clause excluding consequential damages is valid, but that a question of fact exists on whether defendant broke its good faith obligation in its performance of the clause. *See* D.C.Code Ann. § 28:1–203.

When an exclusive remedy is found to fail its essential purpose, parties are then free to seek any other remedies available under the Sales subtitle of the D.C.Code. *Id.* § 28:2–719(2). Here, plaintiff contends that it is entitled to consequential damages related to the remainder of the roofing system and the PPT building structure pursuant to D.C.Code Ann. § 28:2–714(3).

The first test applied to a clause excluding liability for consequential damages is whether it is unconscionable. *Id.* § 28:2–719(3). The determination of a contract's unconscionability is a question of law for the court. *Id.* § 28:2–302(1). *See also* 2 Anderson, *supra* § 2–302:13, at 422. Here, the contract limits defendant's liability "regardless of Owner's damages, including incidental and consequential, and regardless of whether resulting from or arising out of or in connection with any leaks or other failure" of the roofing system. Because plaintiff makes no contentions regarding the contract's unconscionability, the Court finds that the damage restriction clause is not unconscionable.[10]

A second inquiry when examining a damage exclusion clause is whether a party has broken its obligation of good faith in the performance or enforcement of the contract. *See* D.C.Code Ann. § 28:1–203.

District of Columbia courts have not applied the good faith obligation specifically to a damage restriction clause. Most jurisdictions, including Maryland, hold that "a seller who acted in bad faith may not claim the benefit of a limitation of remedy that by itself would be valid." 5 Anderson, *supra* § 2–719:69, at 59. *See Dowty Communications*, 817 F.Supp. at 590 ("Defendant may not rely on the provisions of a contract, including one disclaiming liability for consequential damages, where the defendant was acting fraudulently or in bad faith.").

Here, plaintiff asserts that defendant acted in bad faith in its proposals to repair the polyurethane coatings pursuant to the exclusive remedy in the contract. On several occasions, defendant sought access to the PPT facility's roof in order to apply another layer of 510 coating, which it contends would have fulfilled its exclusive repairs remedy. However, plaintiff argues that its expert witnesses concluded that both roofs were cracked and saturated with water, and defendant's product specifications caution against applying 510 coating to coarse or wet surfaces. Moreover, plaintiff points out that defendant has never tested whether a second application of 510 coating would properly adhere to an existing layer of the same coating. Defendant, on the other hand, offers the testimony of its own expert witnesses who suggest that a second application of 510 coating would have repaired any leaks.

Plaintiff has presented sufficient evidence to create a genuine question of material fact regarding defendant's good faith in its performance of the damages restriction clause. Thus, summary judgment is denied with respect to plaintiff's claim for consequential damages to the remainder of the roofing system and to the PPT building structure.

---

10. Even if plaintiff alleged unconscionability, the Court would find that the damages restriction clause is not unconscionable. Two elements must be shown to establish unconscionability: "absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *See Riggs Nat'l Bank of Washington v. District of Columbia*, 581 A.2d 1229, 1251 (D.C.1990) (quoting *Williams v. Walker–Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C.Cir.1965)). Here, the terms of the damages restriction clause, agreed upon by commercial parties of relatively equal bargaining strength, fail to establish unconscionability. *See, e.g.*, D.C.Code Ann. § 28:2–719(3) (restriction of consequential damages where the loss is commercial is not prima facie unconscionable); *Dowty Communications*, 817 F.Supp. at 589.

*3. Negligence and Strict Liability*

Plaintiff has raised both a negligence claim and a strict liability claim for damages related to the roofing systems as well as to the PPT building structure. For both claims, defendant contends that the "economic loss" doctrine prevents recovery for damages for the loss of value or use of the polyurethane coatings, and that liability disclaimers within the contract preclude damages related to the remainder of the roofing system and the building structure.

### A. *Damages Related to the Polyurethane Coatings*

■ The "economic loss" doctrine bars a tort plaintiff from recovering the "loss of value or use of the product itself, cost to repair or replace the product, or the lost profits resulting from the loss or use of the product." *A.J. Decoster Co. v. Westinghouse Elec. Corp.*, 333 Md. 245, 634 A.2d 1330, 1332 (1994) (citing W. Page Keeton *et al.*, Prosser and Keeton and the Law of Torts § 101, at 665 (4th ed. 1971)). While District of Columbia courts have "not decided whether economic loss is recoverable," *see Bowler v. Stewart–Warner Corp.*, 563 A.2d 344, 355 (D.C.1989) (Ferren, J., concurring), a majority of other jurisdictions rejects claims for economic loss based on negligence, strict liability, or both. *See* 6 Stuart M. Speiser, *et al.*, The American Law of Torts § 18:139, at 159–64 (1989) (citing cases from Alaska, Arizona, California, Colorado, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Minnesota, Missouri, Pennsylvania, Nevada, New Jersey, New Mexico, New York, South Carolina, Texas, and Wyoming). Most recently, Maryland joined those states that refuse to award damages for economic loss under both negligence and strict liability theories.[11] *See Decoster*, 634 A.2d at 1332 n. 2 ("In commercial cases, most courts have refused to allow tort recovery for damage to the product itself, considering such damage solely economic loss.").

■ Applying the economic loss doctrine, plaintiff cannot recover damages relating specifically to the loss of value or use of the polyurethane coatings themselves under either a negligence or strict liability claim. The Court thus grants in part defendant's motion for summary judgment on the negligence and strict liability claims with respect to damages for the loss of value or use of the polyurethane coatings.

### B. *Damages Related to the Remainder of the Roofing Systems and the PPT Building Structure*

Plaintiff alleges that defendant was negligent in its design and testing of the polyurethane coatings, as well as in its training and approval of companies that installed the coatings. Plaintiff thus contends that it is entitled to recover costs related to the roofing system exclusive of defendant's coatings, as well as to the PPT building structure.

■ In the District of Columbia, a disclaimer that bars a manufacturer's liability for negligence is enforceable. *See Moses–Ecco Co. v. Roscoe–Ajax Corp.*, 320 F.2d 685, 687–88 (D.C.Cir.1962). These clauses, however, are narrowly construed by the courts, which require a clear intention on the face of the contract to include such a disclaimer. *See, e.g., id.* (holding that, although a liability disclaimer does not specifically include a reference to negligence claims, the "language of the indemnification agreement is so broad and sweeping as to plainly reveal an intent to encompass losses by negligence"); *Rivers & Bryan, Inc. v. HBE Corp.*, 628 A.2d 631, 635 (D.C.1993).

■ Here, although defendant's liability disclaimer does not specifically refer to negligence claims, it closely follows the language of other disclaimers upheld in previous decisions: "Owner agrees ... to indemnify and hold harmless, the Manufacturer and Applicator from any loss or damage resulting from or arising out of any leaks or failures of the operations necessary to repair any leaks or failures." This language is sufficiently broad and sweeping to encompass losses by negligence, and the Court finds that the liability

---

**11.** *See supra* note 9 (discussing the persuasive value of Maryland law in interpreting District of Columbia law).

disclaimer is binding. Thus, the Court grants defendant's motion for summary judgment on plaintiff's negligence claim for damages related to the remainder of the roofing system and to the PPT building structure.

Plaintiff also brings a strict liability claim seeking to recover the same damages sought in its negligence claim. Unlike negligence disclaimers, disclaimers of strict liability are not enforceable. *See Bowler,* 563 A.2d at 346 (adopting Restatement (Second) of Torts § 402A, cmt. m (1989)); *Payne v. Soft Sheen Prod., Inc.,* 486 A.2d 712, 720 (D.C.1985) (same).[12] Plaintiff's strict liability claim for damages related to the remainder of the roofing system and to the PPT building structure presents genuine issues of material facts. Accordingly, defendant's motion for summary judgment is denied on this claim.

### Conclusion

For the reasons stated, the Court grants in part and denies in part defendant's motion for summary judgment. The Court finds that genuine questions of material fact exist regarding plaintiff's claims for damages based on breach of implied warranty of merchantability and breach of contract. Thus, the Court denies defendant's motion for summary judgment on these counts. The Court also finds that the economic loss theory and the contract's liability disclaimer combine to bar plaintiff's claims based on a negligence theory, and accordingly grants defendant's motion for summary judgment on the negligence count. Lastly, upon applying the economic loss theory, the Court grants defendant's motion for summary judgment with respect to plaintiff's strict liability claim for damages for the loss of value or use of the polyurethane coatings. However, because warranty disclaimers do not apply to strict liability claims, the Court denies defendant's motion for summary judgment with respect to plaintiff's strict liability claim for damages

related to the remainder of the roofing systems and to the PPT building structure.

12. Comment m states, in relevant part: "... The consumer's cause of action does not depend upon the validity of his contract with the person from whom he acquires the product, and it is not affected by any disclaimer or other agreement, whether it be between the seller and his immediate buyer, or attached to and accompanying the product into the consumer's hands...." Restatement (Second) of Torts § 402A, cmt. m (1989).